Larkin does not receive 15 minutes per side. Mr. Gordon for the appellant? Yes, sir. Good morning, judges. Clay, Cook, and White, may it please the court. Ted Gordon representing T.W. or Keisha Clemons. It has been 56 years since the enactment of the Civil Rights Act of 1964, Title VII. Within those protected classes or suspected classes, there is no provision to protect those who have disabilities. The statutory law has attempted to protect them with ADA for adults and with 504 for students or children. At this point in time, they are still treated like second class citizens, and I argue that the 14th Amendment should apply to them so they are no longer second class citizens. In the Merida v. Jefferson County public school case and or the Seattle case, the Jefferson County school case was second to the Seattle case, which is cited in our briefs. That opinion ended with Chief Justice Roberts stating that if you want to stop discrimination, then stop discriminating. I think that applies across the board so that adults and students with disabilities should come under the 14th Amendment. The next area of the issues in behalf of T.W. is the Title IX. It's very interesting on the Title IX that apparently the plaintiff did not produce enough discriminatory evidence to get over to the defendant having the obligation to state some type of nondiscriminatory justification for their action in Title IX. As it turned out, the only other defensive posture was that Coach Rickey was allowed some type of discretion. So let's look a little closer at the Title IX argument. What happens here is, first of all, there is tryouts for the girls tennis program. All right? And under the girls tennis program, there were 12 officially the year 2015. They started with 14 and then they were 12. So Rickey, who I think is the coach, says he actually puts out a handbook where he's going to have tryouts, even though there was no difference from the number of players the year before. There was no complaints about court space. And it was intentionally printed to discriminate against T.W. So as soon as the girls have tryouts and the boys do not, and there's no other legitimate nondiscriminatory justification for the tryouts, to us it is total and complete discrimination to keep T.W. off the Title IX. Council, I thought the contrary argument was that the boys team didn't have tryouts because they didn't have many applicants for the team or interested boys, but there was an overabundance in number of girls and they had to have a way to whittle that down to constitute the team. And that was the reason for the discrepancy in having tryouts for the girls team but not the boys. Why isn't that a reasonable explanation? It is not a reasonable explanation because the girls had the same number. Why do we need tryouts at all? And then the... You don't mean the same number of individuals vying for positions to be on those two teams, right? Right. In other words, there were 12 the year before. There are basically 12 the year that Ricky has tryouts. And the other second reason was that there was not enough court space. 2013-2014, no complaints of anybody, whether the boys team or the girls team, as to proper practice time. It was never mentioned at all within 2013-2014. And as soon as the defensive posture becomes we're not going to spend the money for extra court time or we're going to eliminate girls from participation because we don't have enough court space. That is an absolute violation of Title IX because it has to be equal. In fact, there's a New York soccer case right on point that says when the boys participated in the regionals and the girls didn't, that was a violation of Title IX. So the belief that it was not all aimed, which of course says ways in a little bit to the 504 argument, that it was not all targeted for T. Duxta. I'm hearing static. I'm sorry. Go on. Go forward. We can still hear you. Okay. I'm sorry. But at that point, Coach Ricky, who I think is the of the tennis coaches from the Gold case, he goes ahead and has tryouts. And guess who's the only one trying out? She is treated different, except for her sisters, who are younger. She's totally treated different than any of the other girls that have tried it because they didn't even have to try out. Why is it only T.W. trying out? If she didn't have a disability, we wouldn't be here right now. But what happened to the tryouts? Counsel, I don't know whether you're purposely transitioning to the discrimination claim. I don't see how singling her out is relevant to the Title IX claim. I have segued into the 504. I apologize if I didn't say that. I thought I did. Okay. And are you saying that the boys had more practice time? No. I'm saying the boys had more practice time. It could be presumed from the facts. But no, I'm saying as soon as they intensely discriminated against the girls' team, and especially T.W., because they don't have enough courts to practice on, then the girls' team and all the girls have been deprived of a benefit of practice because they have tryouts. And because of the tryouts... Did the boys have a larger team at any point? No. No. They had about nine. Go ahead. I'm sorry. Is that the most they had, about nine? Yes. Okay. All right. In fact, I think it's a good idea to transition to the 504, because in my view, I think it's the stronger claim. Thank you, Your Honor. So after T.W. tries out, and in fact, before, Coach Rickey didn't even want her on the team. He caused all of this to our position. He had all of this anxiety. I mean, everyone knew about the anxiety just from her actions, that he decided, I've already done this, and I don't even want her on the team. So now he creates a reason or a subtext, and he asks her to try out. And of course, we knew what the result would be before he named it or stated it. And she's off the team because she failed the tryout. Nobody else on the girls team was asked to try out. Ah, but if they rely on coaches' discretion, they really can't, because he was overruled. I must have read this differently, Counsel. I understood that the girls all tried out. The girls tried out. They had to beat one another for their position on the team. And I understand T.W. walked off the court and didn't finish the match. That's a subsequent factual distinction that we would go to next, all right? And there are two go there next. Am I correct in my reading of your brief that there was tryouts for all the young ladies? There are challenge matches. All right. I'll call it tryouts. For the young ladies when they go on the team for seating, okay? And if I could just make one more point at the last, and we'll talk about that next, the point I want to make is that Shelby County Board of Education or some of the administrators therein overruled Ricky. So if you say it's in the coach's discretion, he didn't have any. He was overruled. And they did the, they, at that point, they did the right thing and put her back on the team, which is an interesting statement by the court. So now... Yes, he had already pre-judged her, pre-decided and discriminated against her. But now we come to what I call the April 1st massacre. We have the 504 in place. Tennis is within the 504. And, of course, we know athletics and participation in athletics, whether it's 34 CFR part 134 or whether it's not from the S&S case, that athletics are included. But having said that, on the April 1st massacre case, Tatum, T.W., I'm sorry, T.W. had four matches that she had to compete in. No other team player had four matches, let alone from seats one, two, three, and four. The normal seating procedure, which really came out of Tatum's deposition, is that you challenge someone. If you are sevens on the roster and you want to be six so you can play, you have a challenge match for that person, all right, not one, two, three, four. Okay. The defendant takes the position that it was never a requirement that she play them all in one day. Did you ever counter that? Yes. In other words, on the day in question, and it was supposed to go over two days, the statement from the plaintiff's foster was that she was going to complete them all in one night. Plus there was a thunderstorm on the way anyhow. Mr. Gordon, if I could just briefly interject before you complete your answer. Your honors, he has exhausted his time. Thank you. All right. Well, I just want to get clarification on this. I understand you're saying she intended to do them all in one night, but was there ever a mandate or direction that you need to do all of this today or in one day or anything like that? And if so, where is it in the record? It's under the deposition of Clemons. And Clemons, basically even the two against seat number one and seat number two drained TW with her disability. She was unable to do it. But did we counter that all four had to be done in one day? There is testimony with the plaintiff Clemons that she was going to quit. It was supposed to be two days, but TW had to finish all in one day, which is incredulous. Can you give me a site to where it supports that she was told she had to do it in one day? Just give me a record site. All right. I don't have that record in front of me. Well, you could look that up and indicate that when you come back. Okay. All right. I'm sorry, am I done? Counsel, why don't you wrap up if you could so we can move to your opposing counsel. All right. Thank you, sir. Basically, what happens here is that one after another, she was treated differently because she had no seat at the table. Because of her disability of autism or Asperger's, she was at a different table. She was at a different chair. She was the remarks about her that she was no fun, that she didn't get along with the other girls. All these are symptomatic. And under the Andrew case, that was probably one of the rarest. Excuse me, counsel. It doesn't sound like you're wrapping up. So why don't we conclude your and we can't both talk at the same time. Why don't we conclude your argument right now and we'll hear from opposing counsel. Thank you. All right. Thank you. I apologize. Thank you, your honor. May it please the court, counsel. I want to concentrate primarily on discussing some of the facts that Mr. Gordon mentioned and that were discussed in both of our hearings. And of course, I think the standard of the factual determinations that Judge Stivers made for your standpoint, the standard of review is clearly erroneous and we would suggest that they were not. For starters, the tryout figures that Mr. Gordon laid out were wrong. For the last several years, there have been significantly more girls on the girls team than boys on the boys team. 2013-14 was Mr. Rickey's first year. He's been in tennis since he was 16 years old, played college tennis, and was appalled at the court situation. There were six courts shared by four teams. Sometimes there would be 50 or 60 players. They would get one at a time. Every now and then, they would get two courts. In his handbook, he said, Keith Nethery and I share handbooks. That's the principle. I told him I had so many girls this year before I needed a smaller number for the one court that we would get, maybe two courts. He let the girls know that there were going to be tryouts and that there might be cuts. So, at the end of the day, after TW was placed back on the team for 2014-15... Counsel, I'm sorry. I have a question. Yes, ma'am. By the number of courts, I mean, did the boys and girls practice at the same time? At times, yes. The boys at Martha Lane Collins and the girls at Martha Lane Collins and the boys at Shelby County High School, if none of them had any matches, they would practice after school generally at the same time. Now, as it got lighter in the spring, they could adjust that some, and they did. They also tried some Saturday practices. Okay. Was there always parity between the number of courts allotted to the girls and boys? Yes. They just tried to be fair about it. Again, four coaches, you can't go over and just hog courts. There were some times that Coach Rickey got two, and other times he might have only gotten one. So, they would just... If somebody had a big match coming up, they might defer to that team and let them have more space. So, it was a challenging situation. But what Judge Stiver thought was important is that all the times that are relevant to this lawsuit, there were significantly more girls on the team than boys. So, where's the Title IX violation in making an administrative type discretionary decision? We need to have touch because we have too many players. And you can't give them the attention you need. They don't get the playing time they want, and it's problematic. So, as far as we're concerned, that takes care of the Title IX issue for 2015. Next, I'll go to the April massacre. We know that she was not required to play four matches in one day for several reasons. Let me back up and explain. Both Mom and TW testified that they wanted to earn a letter. They wanted her to earn a letter. So, to get that, you have to play in four matches. She was a singles player. She was not a good doubles player. So, Coach Rickey said, you need to beat one or more of these four good players. We can only take three singles players and two doubles players to each match. So, you need to beat one of them. So, after the 504 for tennis was put into place, they produced a document called TW's Week of Tennis. And it's exhibit R to our motion for summary judgment. I'll try to get the I'm quoting, can be spread out over two days. Okay? Then, also as part of the 504 plan, they had an observer, a Mrs. Sloan, who went to those matches. And she saw a lot of things. She saw TW behaving badly, running off the court, yelling at people and such. But she also heard Coach explain that she could play the matches over two days. Instead, their reaction when they lost the first two matches, Mom told TW to tell Coach that she was done. The next day, they quit and withdrew from school. She was basically with the team for two days on the 2015 season. She did play an exhibition match the day before her picture was in the roster. In fact, the day of the challenge match was the picture day also. So, going back to 2013 and 14, again, this is her first year with Coach Rickey. She does not like him. She doesn't like the conditioning, which she's not used to. She starts out as one of the better players, but as the other players get better, she starts out as one of the better because Rickey's a real coach. He's not a guy that just throws the balls out there. I mean, he knows tennis. So some of his players actually improved. She did not. She also missed a lot of practices. She missed a critical match toward the end of the year to go to a Michael Jackson concert. This other player, R.S., was rapidly climbing up the laps. So, Rickey decides to have a challenge match between R.S. and T.W. There's a lot of noise about they didn't know it was a challenge match or they would have done things different, but the bottom line is they played and T.W. lost. And then, sadly, she literally lost it. She threatened suicide. She said bad things about the coach's son, and they withdrew her from school. So that's twice they've taken her out of school. So at that point, she's out of school. She's off the team. A couple weeks later is the team banquet, which brings us to another complaint. And they don't get official word of the banquet. Well, they're not on the team anymore. And Judge Stivers called this claim the most ludicrous because they ended up actually coming to the banquet. And Coach Rickey even recognized her. So that's another one of their claims. In terms of the whole Title IX issue, the appellants are critical of us of relying on the Heike versus Guerrero case, which is one of your unpublished opinions, which talks about discretion for coaching and not wanting to micromagic manage coaches and so forth. And they want you to rely on the Michigan case. Judge Stivers found they were not similar. The Michigan case dealt with soccer scheduling, which literally deprived girls soccer of club play, all sorts of detrimental issues, whereas Heike versus Guerrero is more of a discretionary who's going to be on the team type of case. So we feel that is the more appropriate law for you to follow. Counsel, let me ask you this. When you have one of the applicable statutes here where you have an individual who is suffering from a disability and we're concerned about the school or the coach accommodating or making reasonable accommodation for the disability, to what extent is it person who's disabled, to the extent that there's some contention that the behavior was disruptive to the team or the person purportedly may throw a temper tantrum here or there or walk away from the team or whatever, do you have any cases that discuss what the school's duty might be in terms of a reasonable accommodation when there might be some disruptive behavior coming from the disabled person? No, I don't judge or we would have cited them for sure. Let me tell you a couple of things that Coach Rickey did do. For starters, I think 504 is off the table for 2013 and 2014 because the mom didn't even bring it to the school's attention until June, and she requested no accommodations until the fall. She requested no tennis accommodations until March, and she was given them with a peer mentor, the document I talked to you about called T's Tennis Week and then the Observer. Coach Rickey also testified that for 2013 and 2014, he did his best to bring her into the team, try to make her part of the team. She would throw rackets. She hit him once. He testified that he would just kind of try to ignore that type of behavior, but it was very disruptive. You know, I guess from a coach's standpoint, you know, the proof is in the pudding. I mean, an athlete that you are trying to rely on to have a successful team, when faced with adversity on two occasions, quits and quits school. So, you know, I think it's a lot to put on coaches to sift through behavioral and mental issues that athletes might have. It's hard enough just dealing with the technical, physical things. I just don't see how you can hold them responsible. They've got her for an hour and a half, two or three days a week, and then maybe, you know, for matches. So, that's the best I can do on that. Council, the action that most concerns me is the decision before any tryouts that she is not going to be on the team the following year, and the reasons are all related to her disability. So, would you address that decision for me, please? I will, and I know the testimony you're talking about. You know, he did testify, and by the way, there were tryouts for, I think, all the girls, but definitely most of the team. There might have been some that missed and such that were number one, but I believe there were tryouts for everyone, and he had a tryout sheet, and he graded everybody when he showed T.W. her forehand. Isn't there testimony that he decided before tryouts that she wasn't going to be on the team? He said that, yes. Okay. But, you know, I guess to put it in sort of legal parlance, for him, she wasn't otherwise qualified, and I guess to view it in a handicap scenario of 504, if a guy rolls his wheelchair onto a football field and says, coach, I want to be the quarterback, he's probably not going to be allowed to be a quarterback, but if a one-arm pitcher, and there are even major league one-arm pitchers prove themselves capable of playing on a baseball team, then they should be on the team. T.W. could not function on the team, threatened suicide, and threatened to blame the coach, so between that and the throwing of the question, in fact, I mean, isn't there evidence on both sides about whether she's otherwise qualified? Well, there might be, but Judge Stivers ruled our way, and whether there's evidence on both sides. I noticed that Judge Stivers, his opinion does not seem to engage with that particular part of the case, that issue that Judge Weiss raises about... I agree. I agree. He didn't talk about it, so that doesn't help. This is to finish, even though he didn't, the findings that he made don't seem to be clearly erroneous. I would end with that if my time is up. Yep. Thank you. Mr. Gordon, you have three minutes for rebuttal. Thank you. Thank you, sir. The first thing is we have reviewed the record. We do not find anything over and above the facts that have been testified to, which is that T.W. had four challenge matches with seed one and seed two, which, once again, we repeat, no one does, but then quit because of her exhaustion and condition when she was supposed to go ahead and play seed three and seed four. The obvious is, if she wasn't to play seed three and seed four on that day, then she had no reason to quit. It would have gone to a second day. May I also say, even after the April 1st massacre where she had to apparently play the top four seeds, which doesn't happen anywhere, she was treated so different because of her disability and everything that Mr. Fitzgerald said were symptomology of her rule, Mr. Rickey, Coach Rickey. So, if he had coach's discretion and that's what they're relying on, it just didn't apply. It just didn't apply because he was overruled twice, which are admissions that whatever his discretion was, wasn't appropriate. I'm sorry. Counsel, how was he overruled in connection with the challenge matches? After the four challenge matches or the two on April 1st, the facts show that she quit, which presumes that she was supposed to play on or she couldn't have quit anything. But having said that, he was overruled because after she quit and allegedly left school, she was put back on the team by the people that were there at courtside. So, on both occasions, Coach Rickey's actions were deemed arbitrary and he didn't have any discretion. Okay, but what do you mean by put back on the team? He never, he didn't, I thought the April 1st matches were after she was on the team and then she quit. He didn't cut her from the team after those matches, did he? He did not, but he did say specifically she had to beat one, if not all of the four to compete on varsity matches. So, it was a fait accompli even if she didn't finish the match. Okay, so you said, I'm sorry. Counsel, please follow me. So, when you say she was put back on the team, she was put back on the team and he was told that she will compete in the matches? I mean, the board changed her feed? The administrators, especially with those watching at courtside, reviewed Coach Rickey's behavior and discretion and she had been on the team technically for two days. She had been in limbo for about six weeks and was not allowed to practice, which is still part of the discrimination, sufficient discrimination to at least create a genuine issue of fact. But after the, and on both occasions, the quote-unquote tryout and the April 1st massacre of having to play four top seeds, the people in control, the administrators and our, it wasn't the board, it was the administrators, overruled Rickey on both occasions. So, they stated and or admitted and then they put her back on the team. Stop, please. You're saying they overruled, yet we were told that the observer, Mrs., I'm not sure the name of the woman asked to observe the match, she observed exceptionally uncompetitive conduct. So, where did the decision to say, oh, that was great, that was a mistake by the coach, it seems contradictory, which she's throwing rackets, she's having breakdowns, and someone overruled that and said, no, no, no, that's okay. Really? Did that happen? Yes. Mr. Gordon, before you answer, just so the panel knows, she's exhausted this time. Go ahead. The end of that answer is, all that was symptomology of her Asperger's or autism, and when it was reviewed, she actually went back to school and was put back on the team. She still never played in any competitive matches, and that is in Clement's deposition, 173, pages 96 to 97. So, in fact, every time Rickey tried to make a coach's discretion, which the defendants allude to, or the appellees allude to, it was changed by administration, and she was put back on the team. She was treated differently. Sorry. Okay. Can you, where is the support for the proposition that he cut her from the team or intended to cut her from the team if she did not win one of those three matches? I thought that she simply quit at that point and that the purpose of the matches was not to see if she would stay on the team, but rather to see if she would play in the meet. No, that's incorrect. I can't find it within 30 seconds. Yeah, it's in the record, replete in the record, that if she didn't beat somebody, she wasn't on the team, and that was overruled. So, what did it matter? Because at that point, she was treated differently because of the symptomology of her Asperger's. If she didn't have Asperger's, she wouldn't, this wouldn't have happened. Everything flows from the total discrimination from the 504 violation. And no one else had to play a match to get on the team. No other of the student tennis, nobody else had to work their way onto the team. No, absolutely. Got it. Thank you. Thank you. Thank you. At this point, I guess the case should be submitted, and you can call the next case when you're ready.